IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JAMES SPRINGER,

                 Plaintiff,

  v.

JOAN HANNULA, LORRAINE SMITH,
PATRICIA HAZUGA, JEAN FELBER, and
SUE SAINDON,

                 Defendants.[1]

OPINION and ORDER

18-cv-747-jdp

---

Pro se plaintiff James Springer dislocated his shoulder while working at Stanley Correctional Institution where he is incarcerated. He says that defendants, all prison medical officials, misdiagnosed his injury and did not schedule an examination by a doctor for more than a week. After screening his complaint, I allowed Springer to proceed claims under the Eighth Amendment to the United States Constitution and Wisconsin negligence law. Dkt. 12 and Dkt. 26.

The four defendants who were employed by the Wisconsin Department of Corrections—Joan Hannula, Lorraine Smith, Patricia Hazuga, and Jean Felber—have moved for summary judgment. Dkt. 61. The fifth defendant, Sue Saindon, was employed by a private company that provided health services on a contract basis. Saindon has not moved for summary judgment. I'll refer to the four who have moved for summary judgment as "defendants" in this opinion.

---

[1] I have updated defendant Patricia Hazuga's name to reflect the spelling in defendants' answer, Dkt. 30.

The material facts are undisputed. Defendants initially misdiagnosed Springer's dislocation, but they did not ignore his injury, nor did they knowingly persist with treatment that they knew would be ineffective. A good-faith misdiagnosis does not violate the Eighth Amendment. Once Springer's dislocation was discovered, Hannula arranged prompt and successful treatment. I will grant defendants' motion on Springer's Eighth Amendment claims.

It also appears that Saindon would be entitled to summary judgment for the same reasons. I will give Springer a short time to show why I should not also grant summary judgment to Saindon on the Eighth Amendment claim. Granting summary judgment to Saindon would leave only Springer's state-law claims in this case. I will likely decline to exercise jurisdiction over the state-law claims if I grant summary judgment to Saindon on the federal claim.

## UNDISPUTED FACTS

I begin with Springer's objections to defendants' facts.

Springer objects to some of defendants' proposed findings of fact as not supported by admissible evidence even though defendants support them with declaration testimony. *See, e.g.*, Dkt. 70, at 2. Declaration testimony is admissible at summary judgment. Fed. R. Civ. P. 56(c)(1)(A). So I overrule all such objections by Springer.

Springer also objects that some of defendants' declaration testimony is false, but he does not cite any admissible evidence to support his version of the facts, as required under Rule 56(c)(1)(A). *See, e.g.*, Dkt. 70, at 2. Because Springer is litigating without the benefit of an attorney, I will deem Springer to have raised a genuine dispute if he could testify to the disputed fact based on his personal knowledge, just as though he had provided a proper declaration statement. *See* Fed. R. Evid. 602 (witness may testify only based on personal knowledge). But

if Springer could not testify about a challenged fact based on his own personal knowledge and he offers no ground for his objection other than that the fact is false, I will treat the fact as undisputed. *See Driveline Systems, LLC v. Arctic Cat, Inc.*, 936 F.3d 576, 580 (7th Cir. 2019) (parties cannot rely on unsupported assertions at summary judgment).

With those clarifications, the following facts are undisputed, except where noted.

On October 25, 2017, Springer injured his left shoulder around 1:40 p.m. when he slipped while pushing a wheeled laundry cart. His left shoulder was pushed up and backwards, after which he heard a crunch.

**A. Smith's first examination**

Springer was seen by the prison's Health Services Unit (HSU) within an hour of his injury. The HSU's examination process typically begins with triage by a nurse, who assesses the inmate's condition and tells defendant Hannula, an HSU doctor, whether Hannula should see the inmate immediately or whether she can see the inmate in a later appointment.

Defendant Smith, an HSU nurse, was the first to examine Springer after his injury. She says that his hair was combed over his face, preventing almost all eye contact. Springer described his injury and complained that he had stretched or torn a muscle in his left shoulder. Smith noted that Springer's shoulders were asymmetric, but Springer said that he had not noticed any significant change in the appearance of his shoulders.

Smith observed that Springer's vital signs were normal. He had a full range of motion in his lower left arm and no pain when gripping. He was able to move his left arm, and he repeatedly pushed on his left shoulder. He did not appear to be in extreme pain, nor did he say that he was in extreme pain, although he did report shooting pain in his armpit. When Smith

examined Springer's left shoulder joint area, he did not grimace. She concluded that the asymmetry in his shoulders could have been caused by a 2015 injury to his shoulder.

Smith then consulted with Hannula, who concluded that Springer had likely sustained a shoulder contusion or sprain. Hannula recommended that Springer ice his injured shoulder, take naproxen for pain, and follow up with HSU the next day. Hannula did not believe that a sling was necessary. Smith conveyed this information to Springer and told him to follow the "P.R.I.C.E." protocol (protection, rest, ice, compression, and elevation). Smith also suggested that Springer not return to work for the rest of that day or the next day.

**B. Saindon's examination**

Springer returned to HSU for a follow-up visit the next day, October 26, where he was examined by defendant Saindon, an HSU nurse. He had a rolled-up towel under his left arm, and he complained of pain in his left shoulder. Saindon described Springer's condition to Hannula, who recommended that Springer stop using the towel and continue to take naproxen and follow P.R.I.C.E. protocol. Based on Saindon's report, Hannula continued to believe that Springer had a shoulder contusion or sprain.

**C. Felber's examination**

On October 27, Springer submitted a health service request form stating that his left shoulder was in constant, excruciating pain. The form was reviewed by Felber, an HSU nurse. Felber replied that Springer had an upcoming appointment with Hannula on November 3. Felber did not consult Hannula regarding Springer's request.

On October 28, Springer sent a letter to Hannula stating that he had been in constant, excruciating pain since October 11, 2012. (The parties do not say whether Springer meant to say that he had been in constant pain for more than five years or whether he simply wrote the

4

incorrect date in his letter.) Hannula did not receive the letter, as nurses often reply directly to inmate correspondence.

Felber replied to Springer's letter on October 29, asking him to come to HSU to discuss his complaint, which he did that day. During his visit, Springer asked to see Hannula, but Felber did not consult her during the appointment. Springer was hyperventilating, and he reported excruciating pain and severe numbness from his wrist to his shoulder. Felber helped him to calm down, after which she examined his left shoulder and arm.[2] She observed that his shoulders were symmetrical, his left arm was pink and warm, his hands were cool, his circulation was good, and he could grasp with his left hand. She noted some bruising in his left underarm area and at the edge of his left chest. Springer said that he was feeling no chest pain. Felber decided to continue the current plan of care and told Springer to follow up with Hannula during his November 3 appointment with her.

**D. Smith's second examination**

On October 30, Smith again examined Springer. Springer reported a burning sensation and extreme pain in his left arm as well as numbness in his left arm and hand. He also said that he was having trouble sleeping because he could not get comfortable. Smith told Springer to continue taking naproxen, to alternate ice and heat, and to elevate his left hand with an extra

---

[2] Springer objects that many of defendants' proposed facts relating to Felber's examination of Springer are not supported by admissible evidence. Defendants reply that these facts are supported by declaration testimony, but no declaration from Felber appears on the docket. Although defendants cite no evidence in support of their description of this examination, Dkt. 62, ¶¶ 14–15, most of their proposed facts are supported by Felber's contemporaneous notes from this visit, Dkt. 67-1, at 3. Springer does not challenge defendants' proposed facts regarding this examination on any other grounds and he does not offer his own account of the examination, so I have taken all facts that are supported by Felber's notes as undisputed. I have not considered any proposed facts about Felber's examination that are not supported by Felber's notes.

5

pillow. Smith gave the advice regarding ice and heat and elevating his hand because she had misunderstood Springer's description of his pain, understanding him to mean that his pain was only in his left hand, not his left arm. She did not consult with Hannula during this visit, and she concluded that he did not need to be seen immediately by a doctor because he did not have any new or worsening symptoms and he had an appointment to see Hannula in four days.

E. **Hazuga's examination**

On October 31, defendant Hazuga, an HSU nurse, received a call from a correctional officer, who told her that Springer wanted to return to work in the laundry room. The officer had denied the request because Springer's arm was swollen. Hazuga asked the officer to send Springer to HSU so she could examine him.

Springer told Hazuga that certain positions for his shoulder felt better than others and that he was experiencing cramps, mostly during the night. His left elbow was moderately swollen and there was bruising at his bicep and below his armpit. His vital signs were good.

Hazuga found it difficult to assess Springer's condition. He made almost no eye contact and spoke in a monotone voice. He did not appear to be in excruciating pain, nor did he tell Hazuga that he was in excruciating pain. He also did not display what Hazuga describes as "classic signs of pain" such as increased blood pressure, sweating, grimacing, or crying. Dkt. 66, ¶ 7. She updated Hannula on Springer's condition. Based on Hazuga's update, Hannula decided that Springer did not need to be seen before his scheduled appointment on November 3. Nothing from Hazuga's report indicated that Springer's shoulder was dislocated.

Hazuga told Springer that he was restricted from work to avoid further injury and that he should continue his current pain relief measures. When Hazuga later learned that Springer's shoulder was dislocated, she was very surprised, because in more than 20 years of nursing

experience, this was the first patient she had examined with a dislocated shoulder who presented like Springer, with a monotone voice, flat affect, no pain behaviors, and a desire to return to work.

F.  **Hannula's examination**

Hannula examined Springer on November 3 during his scheduled appointment. Springer appeared with his hair completely combed forward, covering his face. Like Hazuga, Hannula found it difficult to assess Springer. She could not see his face, there was no eye contact, and she could not read his facial expressions. He was also soft-spoken and did not talk much, and he did not fully cooperate with the examination.

Springer told Hannula that he had injured his left shoulder nine days before, while pushing a heavy laundry cart. He did not present any signs of severe pain such as agitation, grimacing, moaning, or verbally expressing pain. He was able to remove his shirt during the examination. He said that his shoulder had improved but he was still experiencing numbness and tingling in his arm. Hannula noted some atrophy in Springer's deltoid and some bruising over his bicep and armpit. He had no tenderness around his bicep but had mild tenderness at the back of his shoulder and some tenderness in his armpit. He had normal range of motion at his elbow.

Hannula concluded that Springer may have suffered a labral or rotator cuff tear and perhaps some nerve injury. She scheduled an evaluation by physical therapist Jered Kuehn (who is not a defendant) for November 7, the following Tuesday, because Kuehn was available only on Tuesdays. Referral to physical therapy is the standard of care for a non-dislocation shoulder injury. Springer agreed with the plan to go to physical therapy.

In Hannula's medical experience, including experience examining patients with dislocated shoulders, Springer was the first patient she had seen with a dislocated shoulder who was able to remove a shirt without extreme pain or who agreed to physical therapy without fear that it would be too painful. And Springer continued to express a desire to return to work, which was inconsistent with Hannula's experience with patients with dislocated shoulders.

**G. Further treatment**

Springer began physical therapy with Kuehn (who is not a defendant) on November 7. He was uncooperative with Kuehn's attempt to examine him. Kuehn suspected that Springer had "a serious bicep/pectoral strain" that was aggravated by the laundry cart accident "in the setting of a chronic rotator cuff injury." Dkt. 64, ¶ 9.

During his second physical therapy session with Kuehn on November 14, Springer was more willing to participate, which allowed Kuehn to physically examine Springer's left shoulder. He determined that Springer was suffering from, at the minimum, a shoulder subluxation or partial dislocation. He was surprised by his findings because Springer did not act like someone with a dislocated shoulder during his appointments. His body language had not expressed severe pain or distress, he appeared comfortable at rest, and he had unusual willingness to move for a patient with a dislocated joint. Kuehn brought Hannula into the appointment, who diagnosed him with a dislocated left shoulder.

Hannula immediately ordered an expedited MRI of Springer's left shoulder, which took place the following day, November 15, at a local hospital. After viewing the results, Hannula conferred with Bradley Fowler, a Gundersen Health System orthopedic surgeon who is not a defendant. Hannula requested an expedited appointment with Fowler. Fowler confirmed that Springer's left shoulder was dislocated.

8

Springer was taken to Gundersen Lutheran Medical Center in La Crosse on November 16. Springer was first examined by Dr. Robert S. Zink in the emergency room. Zink examined Springer's shoulder and reviewed his records, including the MRI. He agreed that Springer had an "obvious dislocation of the left shoulder." Dkt. 72-1, at 19. After Zink's examination, Fowler manipulated Springer's shoulder back into place.

Kuehn reevaluated Springer's left shoulder on December 19. Springer was in a great mood and thanked Kuehn for his help, reporting that his pain was much less than it had been and that he had stopped wearing his sling. At Springer's last physical therapy appointment, Kuehn reported that Springer's left shoulder was in the best condition it had been in since his 2015 left shoulder injury.

## ANALYSIS

### A.  Eighth Amendment claims

The Eighth Amendment prohibits a prison official from consciously ignoring an excessive risk posed by a prisoner's serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). To violate the Eighth Amendment, the official must be aware of the risk posed by the prisoner's serious medical need and choose to disregard that risk. *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). A prison medical official violates the Eighth Amendment if she is aware of a significant risk to an inmate's health but gives the inmate "blatantly inappropriate" medical treatment or delays treatment for nonmedical reasons, *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (quoting *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007)), But "inadvertent error, negligence or even ordinary malpractice" does not violate the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

9

I allowed Springer to proceed on an Eighth Amendment claim against Dr. Hannula based on the delay in treatment between October 28, when HSU received Springer's letter addressed to Hannula asking for immediate care, and November 3, when she first treated him at his scheduled appointment. And I allowed Springer to proceed on Eighth Amendment claims against nurses Smith, Felber, Hayuga, and Saindon based on their decisions not to refer him to Hannula for immediate treatment.

Summary judgment is appropriate if the facts are not genuinely disputed and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). I will view the evidence in the light most favorable to Springer, the non-moving party, and I draw all reasonable inferences in his favor. *McCottrell v. White*, 933 F.3d 651, 657 (7th Cir. 2019). Disputes over immaterial facts do not preclude summary judgment. *See* Fed. R. Civ. P. 56(a) (court must grant summary judgment if "there is no genuine dispute as to any *material* fact") (emphasis added); *see also Jones v. Union Pac. R.R. Co.*, 302 F.3d 735, 744 n.7 (7th Cir. 2002) (dispute over "immaterial and irrelevant facts" does not preclude summary judgment). And, as I explained at the beginning of the background fact section, any factual dispute must be genuine, which means that Springer must cite evidence to support his version of the facts. Fed. R. Civ. P. 56(a), (c)(1).

In this case the material facts are not genuinely disputed: defendants misdiagnosed Springer's dislocation, but they did not ignore his suffering, nor did they intentionally persist in treatment that they knew would be ineffective. Springer's dislocation had an unusual presentation, which delayed the correct diagnosis. But Springer has adduced no evidence from which a reasonable jury could find that any defendant consciously disregarded his medical need.

1. **Hannula**

At the time HSU received Springer's letter on October 28, Hannula believed that Springer had suffered a shoulder contusion or sprain based on the information she had received from Smith and Saindon. Hannula's initial misdiagnosis did not violate the Eighth Amendment. *Vance*, 97 F.3d at 992. And Hannula's inaction between October 28 and November 3 did not violate the Eighth Amendment because she received no information during this time that could have made her aware of the severity of Springer's injury. She never saw Springer's letter, which Felber read and promptly responded to. Nor was Hannula consulted during Springer's October 29 visit with Felber or his October 30 visit with Smith.

The only new information Hannula received during this period came when Hazuga consulted with her during Springer's October 31 appointment. Hazuga found it difficult to assess Springer's condition because he made little eye contact and spoke in a monotone voice. He did not show any of what Hazuga described as the classic signs of pain, nor did he complain that he was in excruciating pain. Nothing in Springer's visit with Hazuga would have made Hannula aware that Hazuga had misdiagnosed Springer or that he required immediate treatment. And when Hannula did diagnose Springer with a dislocated shoulder, she took swift action to obtain treatment for him, which is evidence that she lacked "the requisite culpable state of mind" for an Eighth Amendment violation, *Dunigan ex rel. Nyman v. Winnebago Cty.*, 165 F.3d 587, 591 (7th Cir. 1999). Hannula is entitled to summary judgment on Springer's Eighth Amendment claim against her.

2. **Smith, Felber, and Hazuga**

Smith, Felber, and Hazuga did not violate the Eighth Amendment by directing Springer to continue treating his injury with naproxen and the P.R.I.C.E. protocol instead of

11

immediately sending him to Hannula. They did not ignore his complaints of pain; instead, they saw him quickly each time he asked to be seen, examined him, and gave him the treatment that they thought was appropriate. And they relied on Hannula's medical judgment, as she had determined that he had a shoulder contusion or sprain, that this treatment was appropriate, and that he could wait until November 3 to see a doctor. Without any obvious evidence that Springer required a doctor's immediate attention, these nurses were entitled to rely on Hannula's judgment. *See McCann v. Ogle County*, 909 F.3d 881, 887 (7th Cir. 2018) (nurse may defer to doctor's judgment if doctor's proposed course of care does not raise obvious risk of harm).

Springer says that the asymmetric position of his shoulders should have led these defendants to conclude that his shoulder was dislocated. But in first assessing Springer's injury, Smith had reasonably concluded that the asymmetry in Springer's shoulders could have been caused by his 2015 shoulder injury because Springer himself reported that he hadn't noticed a change in the appearance of his shoulders. And a total of six medical professionals—four nurses, a doctor, and a physical therapist—physically examined Springer and concluded that he did not have a dislocated shoulder. Several of these professionals remarked that Springer was difficult to assess because he was uncommunicative, he was unwilling to participate fully in his examination, or he did not display normal signs of pain. Again, misdiagnoses do not violate the Eighth Amendment, *Vance*, 97 F.3d at 992, particularly when the diagnosis is complicated by an unusual presentation.

Springer says that Felber should have realized that he needed immediate treatment because he was hyperventilating and because his medical record included Smith's note about his asymmetric shoulders. But even though he was hyperventilating, Felber was able to calm

him down and examine him. Other than some bruising, her examination did not record anything remarkable about Springer's condition. Although Smith had noted the asymmetric position of his shoulders, Felber observed that Springer's shoulders were symmetrical, which Springer does not dispute. Felber, like every other medical professional that saw Springer during this period, concluded that Springer could manage his injury with Hannula's recommended course of care. The fact that Springer's injury was still painful after four days is not evidence that Felber consciously disregarded it or that she knowingly persisted with treatment known to be ineffective.

Springer also challenges Smith's assertion that Springer did not report any new or worsening symptoms during his October 30 examination. He says that he reported new symptoms during this visit that he had not reported on October 29, although he does not say what they were. But a review of the notes from these visits shows that he reported similar symptoms in both visits. On October 29, Felber noted that he reported pain and "severe numbness from wrist to shoulder." Dkt. 67-1, at 3. And on October 30, Smith noted that he complained of a "burning sensation in his l[eft] arm & shoulder causing his l[eft] hand numbness & 'extreme pain.'" *Id.* And Smith gave him additional advice for treating what she believed to be a complaint of hand pain.

No reasonable jury could find that these nurses consciously ignored Springer's condition or knowingly persisted with ineffective treatment. They consulted with Hannula when they believed it was necessary, they treated Springer for what Hannula thought was a shoulder contusion or sprain, and they relied on Hannula's judgment about what treatment was appropriate. They are entitled to summary judgment on Springer's Eighth Amendment claims against them.

### 3. Saindon

Saindon was not employed by the Department of Corrections but by a private company that provided health care services to the prison under a contract. Although Saindon did not join the other defendants' motion for summary judgment and has not filed a motion of her own, it appears that Saindon is also entitled to summary judgment on Springer's Eighth Amendment. Like Smith, Felber, and Hazuga, Saindon examined Springer, gave him what she believed to be appropriate treatment, and relied on Hannula's judgment. But I cannot grant summary judgment to Saindon without giving Springer notice and a chance to respond. Fed. R. Civ. P. 56(f). I will give Springer a short time to show cause why his Eighth Amendment claim against Saindon should not be dismissed.

## B.  Negligence claims

If Springer fails to identify a genuine issue of material fact regarding his Eighth Amendment claim against Saindon, only his state-law negligence claims will remain in the case. When only state-law claims remain, "the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims." *Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010).

The pertinent events occurred less than three years ago, so I see no statute of limitations concerns that would warrant retaining jurisdiction. And because I have not yet considered the merits of Springer's state-law claims, there would be no efficiency in resolving them in this court. Accordingly, if I grant summary judgment to Saindon on Springer's Eighth Amendment claim against her, I will likely dismiss Springer's remaining state-law claims against all defendants without prejudice to Springer pursuing them in state court.

ORDER

IT IS ORDERED that:

1. Defendants Joan Hannula, Lorraine Smith, Patricia Hazuga, and Jean Felber's motion for summary judgment, Dkt. 61, is GRANTED in part. Plaintiff James Springer's Eighth Amendment claims against these defendants are dismissed. The court reserves a ruling on Springer's state-law negligence claims against these defendants at this time.

2. Springer may have until April 29, 2020, to show cause why defendant Sue Saindon is not entitled to summary judgment on Springer's Eighth Amendment claim against her. Saindon may have ten days from the date of Springer's filing to respond.

3. The remainder of the schedule is STRUCK. If Springer shows that Saindon is not entitled to summary judgment on Springer's Eighth Amendment claim against her, the court will hold a scheduling conference to reset the trial schedule.

Entered April 8, 2020.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge